IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **ALI FARAJ, d/b/a 3900 Builders,** | Case No. 1:20-CV-02517-PAB |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **OHIO CASUALTY INSURANCE CO.,** | **MEMORANDUM OPINION AND** |
| **Defendant.** | **ORDER** |

Currently pending are (1) Plaintiff Ali Faraj's Motion for Summary Judgment as to Insurance Policy Coverage Issues (Doc. No. 15); and (2) Defendant Ohio Casualty Insurance Company's Motion for Summary Judgment (Doc. No. 16.) Briefs in Opposition were filed on April 5, 2021. (Doc. Nos. 17, 18.) For the following reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted, as set forth herein.

I.  **Background**

    A.  **Plaintiff's Covered Property**

This matter arises out of Defendant Ohio Casualty Insurance Company's ("Ohio Casualty") denial of Plaintiff Ali Faraj's ("Faraj") insurance claim seeking property coverage under a Builder's Risk – Rehabilitation and Renovation insurance policy, number BMO 59183163, following a fire at the covered property.[1] (Doc. No. 13, ¶¶ 1-6.)

Faraj purchased a commercial property located at 4468-4472 Pearl Road, Cleveland, Ohio ("Property") from his son and his son's business partner. (Doc. No. 13-4, PageID# 370-71.) Faraj

---

[1] The underlying facts are undisputed in this matter. Thus, the Court takes the facts from both parties' motions for summary judgment, as well as the parties' Joint Stipulations of Fact.

hired a contractor, Michael Corrigan, to complete certain renovations to the Property, commencing in February 2018. (*Id.* at PageID# 347.) On July 1, 2018, Corrigan died. (*Id.* at PageID# 346.) Following Corrigan's death in July 2018, no further work was performed at the Property by anyone else at any time. (*Id.* at PageID# 347.) In other words, no repairs or renovations were performed at the Property from July 1, 2018 until December 27, 2019, the date of the fire. (*Id.*)

### B. Policy BMO 59183163 Provisions

On September 21, 2018, Faraj applied for a Builder's Risk – Rehabilitation and Renovation insurance policy for the Property. (Doc. No. 13, ¶ 1.) Ohio Casualty issued the policy, numbered BMO 59183163, to Faraj. (*Id.* at ¶ 2.) This policy was effective from September 21, 2018 to September 21, 2019. (*Id.*) When Faraj's first policy expired, Ohio Casualty issued a second Builder's Risk – Rehabilitation and Renovation insurance policy (the "Policy"), bearing the same policy number, effective from September 21, 2019 to September 21, 2020. (*Id.* at ¶ 3.)

The Policy is comprised of several forms and endorsements. Relevant herein is the Builders' Risk Coverage – Rehabilitation and Renovation Form. (Doc. No. 13-2, PageID# 157.) The Builders' Risk Form reads in relevant part as follows:

> PROPERTY COVERED
>
> "We" cover the following property unless the property is excluded or subject to limitations.
>
> **Rehabilitation and Renovation** – "We" cover buildings or structures while in the course of rehabilitation or renovation as described below.
>
> 1. **Coverage** –
>     a. **Existing Building** – If coverage for Existing Building is indicated on the "schedule of coverages", "we" cover direct physical loss caused by a covered peril to an "existing building" while in the course of rehabilitation or renovation.

> b. **Building Materials** – While "existing buildings" are in the course of rehabilitation or renovation, "we" cover direct physical loss caused by a covered peril to "building materials".
>
> 2. **Coverage Limitations** –
> . . .
> b. **Vacant Building** – Refer to the "schedule of coverages" for a description of the limitation on a vacant "existing building".

(Doc. No. 13-2, PageID# 157.)

The Schedule of Coverages includes a "Description of Project," which reads: "total rehab of the existing structure – new roof, electrical, heating, plumbing, etc." (*Id.* at PageID# 147.) The Schedule of Coverages also includes a subsection titled "COVERAGE LIMITATION." This subsection includes the Vacant Building limitation, which reads:

> ( X ) **Vacant Building** – "We" only cover a vacant "existing building" for ___ consecutive days from the inception date of this policy unless building permits have been obtained and rehabilitation or renovation work has begun on the "existing building".
>
> (  ) **Vacant Building Limitation Waived**

(*Id.* at PageID# 148.) The Vacant Building Limitation is marked with an X in the parentheses to the left, while the parentheses next to "Vacant Building Limitation Waived" are empty. The line next to "consecutive days" within the Vacant Building Limitation is left blank in Faraj's Policy. (*Id.*)

The Policy defines "Existing Building" as follows:

> 3. "Existing building" means a building or structure that was constructed and standing prior to the inception of this policy and that will undergo renovation or rehabilitation.
>
> An "existing building" only includes those parts of a standing building or structure that are intended to become a permanent part of the building or structure during renovation or rehabilitation.

(*Id.* at PageID# 170.) The Policy does not define "rehabilitation" or "renovation."

3

### C. Fire Occurs at Plaintiff's Property

On December 27, 2019, a fire occurred at Faraj's Property. (Doc. No. 13, ¶ 6.) Faraj timely notified Ohio Casualty of the fire on December 27, 2019 and made a claim for property coverage under the Policy. (*Id.*) Ohio Casualty hired an inspector to investigate the fire and inspect the Property. (*Id.* at ¶¶ 8-10.) As part of the investigation, Faraj provided Ohio Casualty with records and documents related to the Property and was the subject of an Examination Under Oath conducted by Ohio Casualty on June 3, 2020. (*Id.* at ¶¶ 9, 11.)

On September 3, 2020, Ohio Casualty denied Faraj's insurance claim. (*Id.* at ¶ 12.) Ohio Casualty concluded, based on its investigation and review of the Policy, there was no coverage available for Faraj's loss. (Doc. No. 13-5, PageID# 472.) Ohio Casualty provided four grounds for its denial of coverage under the Policy, two of which are relevant to the instant Motions:[2]

- The policy only provides coverage for an "existing building" while in the course of rehabilitation or renovation and the Building was not in the course of rehabilitation or renovation at the time of the fire or at any time during the policy period.
- The Vacant Building Limitation was not waived, and thus, there is no coverage for the Building because at the time of the fire it was vacant and no building permits were obtained for any rehabilitation or renovation work.

(Doc. No. 13-5, PageID# 474.)

Following Ohio Casualty's denial of Faraj's claim, Faraj filed the instant matter in the Cuyahoga County Court of Common Pleas on October 7, 2020. (Doc. No. 1-1.) Faraj brought three claims: (1) Declaratory Judgment; (2) Breach of Contract; and (3) Bad Faith. (*Id.*) Ohio Casualty removed the case to this Court on November 9, 2020. (Doc. No. 1.) To narrow the scope of this case

---

[2] The Court will not address Ohio Casualty's other two grounds for denying coverage, which relate to Ohio Casualty's belief that the fire was set intentionally. Discovery has not commenced on whether the fire was set intentionally and, thus, these two grounds are beyond the scope of the instant Motions for Summary Judgment. *See* Order Granting Defendant's Rule 56(d) Motion, Doc. No. 24.

4

at the outset, the parties agreed to defer discovery and file cross-motions for summary judgment on certain insurance coverage issues. (Doc. No. 26.) The parties filed Joint Stipulations of Fact on February 25, 2021, prior to the filing of their cross-motions for summary judgment on March 5, 2021. (Doc. Nos. 13, 15, 16.)

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may

also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### III. Analysis

#### A. Interpretation of Insurance Contracts Under Ohio Law

Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (*citing Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). A court "examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

The absence of definitions does not necessarily make terms ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995); *see also Penton Media, Inc. v. Affiliated Fm Ins. Co.*, No. 1:03-cv-2111, 2005 WL 8171363, at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)) ("Simply because a term in a contract is not defined does not mean that the policy is ambiguous."). "'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.'" *Guman*, 652 N.E.2d 684 at 686 (quoting *Inland Refuse Transfer Co. v.*

*Browning-Ferris Inds. of Ohio, Inc.* 474 N.E.2d 271, 272 (Ohio 1984)). Thus, a court must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. . . . As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* Moreover, "a contract term is not ambiguous simply because parties disagree about its meaning." *Tattletale Portable Alarm Sys., Inc. v. MAF Prods., Inc.*, No. 2:14-cv-00574, 2016 WL 5122545, at *6 (S.D. Ohio Sept. 21, 2016) (citing *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992)).

On the other hand, if a contract is ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent." *Id.* A court may not "alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Id.* at 1261-62. In the insurance context, "[i]f provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.'" *Sharonville*, 846 N.E.2d at 836 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, syllabus (Ohio 1988)). "Additionally, 'an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded.'" *Id.* (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* 597 N.E.2d 1096, 1102 (Ohio 1992)).

This rule has limitations. While an insurance policy that is "reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261 (quoting *Morfoot v. Stake*, 190 N.E.2d 573, syllabus (Ohio 1963)).

### B. Existing Building Coverage Provision

In denying coverage for the damage sustained in the December 27, 2019 fire at the Property, Ohio Casualty invoked the language of the Policy's Existing Building Coverage provision, specifically that Ohio Casualty only agreed to provide coverage for the Property "while in the course of rehabilitation or renovation." (Doc. No. 13-5, PageID# 474.) Faraj asserts that this provision does not preclude coverage because the Property was "in the course of rehabilitation or renovation" since renovations began in 2018 and were only "paused" due to the death of Faraj's contractor. (Doc. No. 15, PageID# 485.) Ohio Casualty contends that it properly denied Faraj's claim because no renovation or rehabilitation work had been performed at the Property since July 2018. (Doc. No. 16, PageID# 499.) The Court concludes that Faraj's Property was not "in the course of" any rehabilitation or renovation and, therefore, Ohio Casualty properly denied Faraj's claim.

The Court begins its analysis by examining the plain language of the Existing Building Coverage provision. *See Westfield Ins. Co.*, 797 N.E.2d at 1261. The Policy provides that "[i]f coverage for Existing Building is indicated on the 'schedule of coverages', 'we' cover direct physical loss caused by a covered peril to an 'existing building' while in the course of rehabilitation or renovation." (Doc. No. 13-2, PageID# 157.) Neither the phrase "while in the course of," nor the terms "rehabilitation" or "renovation" are defined in the Policy. (*See* Doc. No. 13-2.) Thus, the Court will look to the plain and ordinary meanings of "while in the course of," "rehabilitation", and "renovation".

The relevant definition for "while" is "during the time that," *e.g.*, "take a nap *while* I'm out." *While*, *Merriam-Webster,* https://www.merriam-webster.com/dictionary/while (last visited June 7, 2021). The relevant definition for "course" is: "progression through a development or period or a

series of acts or events." *Course, Merriam-Webster*, https://www.merriam-webster.com/dictionary/course (last visited June 7, 2021). "Renovation" is a noun related to the transitive verb "renovate." *Renovate, Merriam-Webster*, https://www.merriam-webster.com/dictionary/renovation (last visited June 7, 2021). To "renovate" means "to restore to a former better state (as by cleaning, repairing, or rebuilding)," or to "restore to life, vigor, or activity," as to "revive." *Id.* "Rehabilitation" means "the action, process, or result of rehabilitating or of being rehabilitated: such as . . . the restoration of something damaged or deteriorated to a prior good condition." *Rehabilitation, Merriam-Webster*, https://www.merriam-webster.com/dictionary/rehabilitation (last visited June 7, 2021). To "rehabilitate" means "to restore to a former state (as of efficiency, good management, or solvency)," or "to restore or bring to a condition of health or useful and constructive activity." *Rehabilitate, Merriam-Webster*, https://www.merriam-webster.com/dictionary/rehabilitate (last visited June 7, 2021). Therefore, taking the phrase "while in the course of" and the words "rehabilitation" and "renovation" together according to their ordinary meanings, the phrase "while in the course of rehabilitation or renovation" means *during* the time of a series of acts intended to restore a property to a previous or better condition.

In this case, it is undisputed that no work took place at the Property after July 1, 2018. (Doc. No. 13-4, PageID# 347.) Thus, the dispositive question here is not whether Corrigan's work between February and July 2018 qualifies as "rehabilitation" or "renovation," as those terms are commonly understood, but whether Faraj's Property was "*in the course of*" renovation or rehabilitation. The Court concludes that it was not. Faraj testified that, after Corrigan died unexpectedly in July 2018, "no work" occurred at the Property. (*Id.*) Based on Faraj's own testimony, 18 months passed between

the last time any renovation was performed on the Property and when the fire occurred. Further, according to Faraj's Examination Under Oath, after the fire, Faraj wrote to his public adjuster that the renovations on the Property started in February 2018 and "stopped in June of 2018." (*Id.*) While Faraj argues that the presence of "sawhorses, roll linoleum flooring, assorted small tools and used plumbing appliances" at the Property indicates that renovations were ongoing, Faraj offers no evidence to suggest that those materials arrived at, or were utilized to renovate, the Property any time after July 2018. (Doc. No. 20, PageID# 625; Doc. No. 18-1, PageID# 548.) Accordingly, the Court concludes that the renovations to the Property ended by July 2018 and, therefore, the Property was not "in the course of renovation or rehabilitation" at any time during the relevant Policy period.

Faraj's suggestion that the instant case is similar to *Baker v. Nationwide Mut. Is. Co.* is not persuasive. (Doc. No. 15, PageID# 486.) *Baker* is easily distinguishable. In *Baker*, the plaintiff worked on the insured property "*continuously* from March 2007 through June 2010." *Baker v. Nationwide Mut. Ins. Co.*, No. 12-CA-010236, 2013 WL 1905334, at *3 (Ohio 9th Dist. Ct. App. May 6, 2013) (emphasis added). According to the *Baker* court, the plaintiff performed a variety of renovations to his property from 2007 through 2010, including one week prior to the loss event. *Id.* Conversely, Faraj did not "continuously" renovate his Property for an extended period of time. Rather, Corrigan worked on Faraj's Property for four months and, when Corrigan died, the work on the Property stopped. (Doc. No. 13-4, PageID# 346-47.) Faraj did not perform any work on the Property for 18 months, from July 1, 2018 through December 27, 2019. (*Id.*)

Moreover, Faraj's attempt to recharacterize the end of the Property renovations as a "pause" due to Corrigan's unexpected death is unavailing. (Doc. No. 17, PageID# 513; Doc. No. 20, PageID# 627.) First, as discussed above, Faraj told his public adjuster that the renovations to the Property

stopped in June of 2018.  (Doc. No. 13-4, PageID# 347.)  Second, the Court disagrees with Faraj that a cessation of work for 18 months is a mere "pause" and that the Property nevertheless remains "in the course of renovation."  Third, Faraj's *intention* to complete additional work to the Property does not render the Property in the course of renovation.  *See Belich v. Westfield Ins. Co*., No. 99-L-163, 2001 WL 20751, at *3 (Ohio 11th Dist. Ct. App. Dec. 29, 2000) ("Renovation contemplates something being done *at the building,* not merely planning to renovate, remodel, or refurbish."); *see also, e.g., 38 Sequoia Assoc., LLC v. Lumbermen's Mut. Cas. Co.*, 114 Fed. App'x 28, 29 (2d Cir. 2004) (rejecting the appellant's argument that its "intent to start renovations, coupled with the previous owner's renovation work, amounts to a continuous stream of renovations such that the building should come within the terms of the contract" and concluding that the appellant's "lack of renovations is dispositive").  According to the terms of the Policy, Ohio Casualty provides coverage to the Property "while in the course of renovation or rehabilitation"—*i.e.*, *during* renovation or rehabilitation.  (Doc. No. 13-2, PageID# 157.)  An *intent* to renovate does not equate to actually renovating the Property.

Finally, Faraj's argument that the Policy only requires that the Property be "in the course of" renovation, not that the rehabilitation or renovation have occurred during the Policy period misinterprets the Policy language.  (Doc. No. 20, PageID# 626.)  The Policy clearly provides that an existing building is covered "*while in the course* of rehabilitation or renovation."  (Doc. 13-2, PageID# 157.)  Applying the plain meaning of the phrase "while in the course of," Policy coverage begins when the renovation or rehabilitation begins.[3]  As concluded above, the Property renovations

---

[3] This interpretation is also consistent with accepted authorities on insurance law.  *See, e.g.*, Couch on Insurance (3d Ed. 1998) (updated June 2021), § 102:31, "Builder's risk, generally; buildings" ("A 'builder's risk' policy that insures during the "course of construction," regardless of its date, becomes effective as of the time construction begins.").

11

ended on July 1, 2018. Faraj did not commence further renovation between September 21, 2019 and December 27, 2019. Because Faraj had not yet commenced renovating his Property, coverage was not yet triggered. Faraj may not attempt to bootstrap coverage by claiming that renovations that ceased 18 months prior to the fire qualify as *ongoing* renovations. *See, e.g., Park Reserve, LLC v. Peerless Ins. Co.*, No. 14-0763-CV-W-ODS, 2015 WL 6150420, at *2 (concluding the phrase "in the course of rehabilitation or renovation" is unambiguous and rejecting the plaintiff's argument that "the phrase "covers buildings purchased for the purpose of construction in which work has not yet begun"). *See also 38 Sequoia Assoc., LLC*, 114 Fed. App'x at 29 ("The policy, by its terms, applies only to buildings in the course of construction or renovation.").

Accordingly, the Court concludes that the Property was not "in the course of rehabilitation or renovation." Therefore, Ohio Casualty properly denied Faraj's claim under the terms of the Existing Building Coverage Provision.

### C. Vacant Building Limitation

Because the Property was not "in the course of rehabilitation or renovation," this was a sufficient reason for Ohio Casualty to deny Faraj's Policy claim. However, in addition to denying Faraj's claim based on the Existing Building Coverage provision, Ohio Casualty also denied Faraj's claim based on the Vacant Building Limitation. (Doc. No. 13-5, PageID# 474.) Thus, the Court will briefly address this additional independent ground for denial of coverage.

As a separate and independent ground for denying Faraj's Policy claim, Ohio Casualty invoked the language of the Policy's Vacant Building Limitation, specifically the "Vacant Building Limitation was not waived, and thus, there is no coverage for the Building because at the time of the fire it was vacant and no building permits were obtained for any rehabilitation or renovation work."

(Doc. No. 13-5, PageID# 474.)  Faraj asserts that the Property was not vacant at the time of the fire and, even if the Court concludes the Property *was* vacant, the entire Vacant Building Limitation is ambiguous because it does not specify a number of days in the limiting provision and should thus be construed in Faraj's favor. (Doc. No. 15, PageID# 489.)  Ohio Casualty asserts that the Property was vacant throughout the applicable Policy period. (Doc. No. 16, PageID# 503.)  Further, Ohio Casualty contends that the Policy unambiguously contains a coverage limitation for vacant buildings. (*Id.* at PageID# 502.)  Ohio Casualty argues that the instant limitation is not ambiguous simply because it does not specify the number of days the Property may be vacant. (*Id.*)  The Court concludes that Faraj's Property was vacant, and moreover, that the limitation is not ambiguous.

### 1. Whether Property was Vacant

The Court begins its analysis by examining the plain language of the Vacant Building Limitation. *See Westfield Ins. Co.*, 797 N.E.2d at 1261.  The Policy provides that Ohio Casualty will "only cover a vacant 'existing building' for ___ consecutive days from the inception date of this policy unless building permits have been obtained and rehabilitation or renovation work has begun on the 'existing building'." (Doc. No. 13-2, PageID# 148.)  The Policy does not define "vacant." (*Id.*)  The Court will therefore look to the plain and ordinary meaning of "vacant."

The Merriam-Webster dictionary lists several definitions for "vacant," including: "not occupied by an incumbent, possessor, or officer," as in "a *vacant* office"; "being without content or occupant," as in "a *vacant* seat on the bus"; "not lived in," as in "*vacant* houses"; and "not put to use," as in "*vacant* land". *Vacant, Merriam-Webster*, https://www.merriam-webster.com/dictionary/vacant (last visited June 8, 2021).  The Court concludes that a "vacant" property is one that is not occupied, lived in, or otherwise used.

13

Given the plain meaning of the word "vacant," the Court concludes that Faraj's Property was vacant at the time of the fire. First, Faraj admitted in his Examination Under Oath that the Property was vacant the entire time that he owned it. (Doc. No. 13-4, PageID# 332.) Second, Faraj evicted two squatters sometime in mid-2018 and never rented any residential or commercial units to tenants during the time he owned the building. (*Id.* at PageID# 289-93.) Third, as established above, renovations at the Property ceased by July 2018. *See supra*. The Property was entirely empty since July 2018, lacking both tenants and inanimate objects.[4] Accordingly, the Court concludes that the Property was vacant.

### 2. Whether Vacant Building Limitation is Ambiguous

Having concluded that the Property was vacant throughout the Policy period, the Court will address whether the Vacant Building Limitation is nevertheless ambiguous because the provision does not specify how many consecutive days from the inception date of the Policy that the Property may remain vacant. Faraj and Ohio Casualty offer competing interpretations. According to Faraj, the provision is "rendered meaningless without specifying a number of days for the limiting provision." (Doc. No. 15, PageID# 489.) Faraj contends that a reasonable trier of fact could conclude that the blank could contain a number anywhere from 0 to 364 days. (Doc. No. 17, PageID# 515.) Ohio Casualty argues that the provision is reasonably interpreted to mean that the Policy does not permit *any* days of vacancy and that Faraj may not write in a number after the fact. (Doc. No. 16, PageID# 503.)

---

[4] The Court rejects Faraj's argument that a few random items strewn throughout the Property render it "unoccupied", rather than "vacant". (Doc. No. 15, PageID# 488.) Indeed, the Seventh Circuit rejected this exact argument in Faraj's cited case, *Myers v. Merrimack Mut. Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986). The presence of a few broken chairs and shelves, unused building equipment and materials, and a few random disconnected appliances does not prevent the Court from concluding that the Property was vacant. *Id.*

"Although ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured, . . . it is equally well settled that a court cannot create ambiguity in a contract where there is none. . . . Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citing *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380 (Ohio 1988), *Hacker v. Dickman*, 661 N.E.2d 1005 (Ohio 1996) (internal citations omitted)). Moreover, a court "examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

The Court concludes that there is no ambiguity in the Vacant Building Limitation. The Court finds that Ohio Casualty's interpretation is the only reasonable interpretation of the Vacant Building Limitation. *See Lager*, 896 N.E.2d at 669. There is nothing in the Policy language to support Faraj's contention that a blank or null space can be interpreted to mean any number greater than zero. (*Id.*) Faraj's proposed interpretation requires the Court to insert additional language into the Policy, which it may not do. *Westfield Ins. Co.*, 797 N.E.2d at 1262. Thus, Faraj's proposed interpretation is unreasonable. Moreover, the parties unambiguously selected the Vacant Building Limitation and did not opt to waive the limitation, demonstrating that the parties clearly intended to limit coverage over vacant buildings. (Doc. No. 13-2, PageID# 148.)

Accordingly, the Court concludes that the Vacant Property Limitation is not ambiguous and, therefore, Ohio Casualty also properly denied Faraj's claim under the Vacant Building Limitation.

D. **Breach of Covenant of Good Faith and Fair Dealing**

As discussed above, the Policy does not provide coverage for Faraj's claimed losses for multiple reasons. Therefore, Ohio Casualty's denial of coverage was reasonable and Faraj's bad faith

claim fails. *See Cleveland Freightliner, Inc.* v. *Federated Serv. Ins. Co.,* No. 1:09-cv-1108, 2010 WL 395626, at *13 (N.D. Ohio Jan. 26, 2010) ("Ohio law clearly states if denial of coverage is appropriate there is no bad faith.") (citing *Hahn's Elec. Co. v. Cochran*, 2002 WL 31111850, at *8 (Ohio 10th Dist. Ct. App. 2002)).

### IV.     Conclusion

Accordingly, for the reasons set forth above, Defendant Ohio Casualty's Motion for Summary Judgment is GRANTED and Plaintiff Ali Faraj's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Date:  June 9, 2021

        *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE